**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 25-cr-70 (ACR)** |
| **TALIB ABDUL-WALI,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION TO SUPPRESS**

On February 26, 2025, MPD Officers on patrol in southeast D.C. obtained a firearm from Defendant Talib Abdul-Wali's person. ECF No. 1 at 1. For the reasons stated below, Mr. Abdul-Wali moves this Honorable Court to suppress that firearm as the fruit of an unlawful search and seizure.

**BACKGROUND**

I.    **Facts**

On February 26, 2025, MPD officers on patrol in southeast D.C. passed by Defendant Talib Abdul-Wali as he stood at the hood of his friend's white SUV. ECF No. 1 at 2. Less than two minutes prior, per CCTV footage, at 6:32pm, Mr. Abdul-Wali's friend had placed one opaque bottle on the hood of that SUV. (Community center surveillance footage ("CCSF") at 1:45-2:15).

1



*Exhibit 1 – friend walking with bottle to the white SUV*



*Exhibit 2 – friend placing bottle on the white SUV*

Forty-five seconds later, at 6:33pm, Mr. Abdul-Wali walked over from down the street with a bottle and water bottle in hand and picked up the bottle placed on the white car by his friend (CCSF at 2:37-2:45). At that very moment, the first of

two MPD vehicles passed by Mr. Abdul-Wali. (CCSF at 2:45). Ten seconds later, the second vehicle passed. (CCSF at 2:55). Within ten seconds, both vehicles circled back and parked next to and in front of Mr. Abdul-Wali. (CCSF at 3:05 to 3:15). Two officers left the car immediately parked next to Mr. Abdul-Wali. The officer sitting in the passenger seat opened his door, pointed to an unsuspecting Mr. Abdul-Wali, who was holding two white and gold opaque bottles along with a plastic water bottle, and demanded, "Let me see that. Is that alcohol?" (BWC at 2:07-2:10). Mr. Abdul-Wali, frozen, responded, "huh?" *Id.* The officer repeated, "let me see" and proceeded to grab the bottle with the cups on it. (BWC at 2:09-2:13).



*BWC at 2:06*

Unsuspecting that he did anything wrong, Mr. Abdul-Wali said, "here's it right here," and gave the officer the unopened bottle that had carried to the white SUV. (2:12-2:15).

3



The officer removed the cups from the first bottle, saw that it had been opened, and told Mr. Abdul-Wali that he was not allowed to have the bottle under any circumstances. (BWC 2:15-2:25). The officers proceeded to place Mr. Abdul-Wali in handcuffs. (BWC 2:25-2:40). Within ten seconds, an additional four officers from two other vehicles walked over to the area and surrounded Mr. Abdul-Wali. The officers found a firearm in Mr. Abdul-Wali's waistband. Compl. at 2.

## II.    Legal Principles

Four non-controversial and well-established principles of Fourth Amendment jurisprudence guide the resolution of Mr. Abdul-Wali's motion. ***First***, a person is seized for purposes of the Fourth Amendment when the totality of circumstances "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business or, put another way, a

reasonable person would have believed that he was not free to leave." *United States v. Gamble*, 77 F.4th 1041, 1044 (D.C. Cir. 2023) (cleaned up).

**Second**, police may only "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "The officer, of course, must be able to articulate something more than an "'inchoate and unparticularized suspicion or "hunch,"' *id.*, (quoting Terry, 392 U.S. at 27),and must have "some minimal level of objective justification" for making the stop, *id.* (cleaned up).

**Third**, where the officer lacks reasonable suspicion to effect a search or seizure, the officer may seek the party's consent to search. *United States v. Matlock*, 415 U.S. 164, 165–66 (1974). Such consent, however, must be "unequivocal and specific, [and] freely and intelligently given." *United States v. Lindsay*, 506 F.2d 166, 173 (D.C. Cir. 1974). It cannot be "the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 248 (1973). Further, "[t]he government's burden of showing consent 'cannot be discharged by showing no more than acquiescence to a claim of lawful authority.'" *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968); *see also United States v. Glover*, 144 F.4th 336, 341 (D.C. Cir. 2025) ("'[C]onsent is ineffective if it follows an express or implied claim by the police that they can immediately proceed to make the search in any event.'") (quoting *Orhorhaghe v. INS*, 38 F.3d 488, 501 (9th Cir. 1994)).

***Fourth***, "[t]he investigative methods employed [in a *Terry* stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Consequently, a *Terry* "stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017).

When a defendant has been seized or searched without a warrant, "the burden shifts to the government to justify the warrantless" action. *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015). This burden is not without meaning. When a defendant moves to suppress the fruits of a warrantless search and seizure, the government is obligated to justify every aspect of any stop, arrest, or search. A failure to do so is a concession that the officers in question acted in violation of the Fourth Amendment. A defendant, in turn, has no obligation to theorize about or otherwise anticipate the government's justifications for its warrantless actions.

## **ARGUMENT**

### I.    The Officers Had Neither Probable Cause nor Reasonable Suspicion to Seize and Search Mr. Abdul-Wali.

Mr. Abdul-Wali was seized the moment officers pulled up in their MPD vehicle and jumped out because the totality of circumstances at that moment "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business or, put another way, a reasonable person would have believed that he was not free to leave." *See Gamble*, 77 F.4th at 1044. To answer this question, a court must consider "all the objective

6

circumstances of the encounter," rather than examining individual facts in isolation. *United States v. Lewis*, 921 F.2d 1294, 1297 (D.C. Cir. 1990). Facts to consider when deciding whether an encounter amounted to a Fourth Amendment seizure include: the time of day, the location of the encounter, the officer's tone, whether weapons or handcuffs were displayed, if officers were wearing a uniform, whether the officer physically touched the individual, whether the officers threatened or intimidated the individual, whether the officers retained the individual's identification, what commands the officer gave during the encounter, the number of officers involved, and whether officers had blocked the individual's path. *United States v. Jones*, 374 F. Supp. 2d 143, 148 (D.D.C. 2005).

It is obvious that a reasonable person standing in for Mr. Abdul-Wali, accounting for all the circumstances of the encounter, would believe that he was not free to leave. The number of officers and their placement, combined with the tone of the officers and the manner in which they approached qualifies this encounter as a seizure under the Fourth Amendment. *See United States v. Freeman*, Case No. 25-cr-127 (BAH), Tr. from Motion to Suppress Hearing at 30 (Aug. 13, 2025) (hereinafter "*Freeman* Tr.") (finding seizure where "defendant is blocked on all sides by police officers and police cars were parked only within a few feet"). The officers, after having rapidly pulled up in their MPD vehicle, which had already passed by once, proceeded to jump out of their car to address Mr. Abdul-Wali. Within seconds, they were joined by four additional officers in two vehicles. At the point of the first officer's jump-out, Mr. Abdul-Wali was trapped between a fence to his left, cars in

7

front of and behind him, and the first MPD cruiser to his right. Two additional MPD vehicles were quickly approaching from in front and behind him. And the first officer immediately demanded "Let me see that," upon exiting his car. There is no question that officers did not allow Mr. Abdul-Wali to walk away, and certainly no reasonable person would have felt free to leave in that scenario. *Id.*; *United States v. Delaney*, 955 F.3d 1077 (D.C. Cir. 2020) (any "'attempt [by the defendant] to leave the scene would be so obviously likely to prompt an objection from the officer . . . that no reasonable person 'would feel free to leave in the first place'") (quoting *Brendlin v. California*, 551 U.S. 249, 257) (2007)).

Mr. Abdul-Wali's detention, even if it began as an investigatory stop, immediately evolved into an arrest due to the show of force involved. When officers detain a person and the detention becomes unduly intrusive, the detention "transforms from an investigative stop into an arrest requiring probable cause." *Hall*, 867 F.3d at 153. Though there is no bright line as to when Mr. Abdul-Wali's detention became an arrest, *id.*, certainly the show of force by the officers and his accompanying officers was unduly intrusive to investigate the alleged offense— possession of an open container of alcohol. And it is well-established that a *Terry* stop must involve the least intrusive means possible reasonably available to quickly confirm or dispel the officer's suspicion. *Royer*, 460 U.S. at 500. Here, instead of calmly approaching Mr. Abdul-Wali and inquiring whether he had been drinking or was carrying an opened bottle alcohol, officers sped towards him, surrounded him, jumped out at him, and demanded "Let me see that" before snatching his bottle out

of his hand and lifting the cup off it, which was an unlawful search in itself. *See infra* at 13–16. These actions are a far cry from the actions highlighted by the D.C. Circuit as appropriate for an investigative stop. *Jones*, 584 F.3d at 1086 (finding actions of a group of officers slowly approaching partygoers and requesting a person who said he had been drinking to "come here" to be appropriate investigative actions).

Regardless of whether Mr. Abdul-Wali was arrested or stopped, officers had no authority to do so. To detain Mr. Abdul-Wali, the officers would have needed at least reasonable suspicion that Mr. Abdul-Wali was committing a crime. But no such suspicion existed. From their vehicle, the officers could make out only that Mr. Abdul-Wali was holding two opaque white bottles. (BWC at 2:06). They could not see the tops of the bottles to know whether they had been opened at all. They could not see the inside or bottom of the bottles to know whether they contained any liquid inside of them. They could not even tell whether the bottles were liquor bottles at all compared to, for example, bottles of sparkling cider. Oddly enough, Mr. Abdul-Wali's appearance readily gave him away as a practicing Muslim, and any reasonable observer (and certainly any experienced police officer) would have likely thought he was holding a bottle of anything *except* alcohol.

Indeed, the officers' actions show that they acted out of a hunch, but a "mere hunch" is insufficient to even constitute reasonable suspicion, let alone probable cause. *Sokolow*, 490 U.S. at 7. Upon exiting the first MPD vehicle on site and approaching Mr. Abdul-Wali, the passenger-side officer openly wondered whether

9

the bottles he was seeing were in fact holding alcohol at all. (BWC at 2:06 (asking, "Is that alcohol?")). Certainly, as the body-worn camera footage showed, the officer could not see the top of the bottles to even be able to understand whether the bottles had yet been opened. *Id.* But instead of asking whether the bottle contained alcohol in a non-intrusive manner, the officers' first action was to *demand*, "Let me see that" and then snatch the bottle with the cups on it out of Mr. Abdul-Wali's hands. The first officer's later actions (lifting the bottle and examining its label) in fact shows that the officers had no more than a hunch that the bottles were alcohol and had been opened (BWC at 6:33:52).

This case mirrors the initial circumstances involved in *United States v. Jones*, 584 F.3d 1083, 1086 (D.C. Cir. 2009), where a group of people were outside at night in a "residential neighborhood" in what appeared to be "party atmosphere." *Id.* The defendant had "carrying a large white styrofoam cup in his hand and a brown paper bag under his arm," and the group was approached by "[f]ive or six police officers exit[ing] two cars." *Id.* The Court of Appeals agreed that these facts did not constitute "a basis for a *Terry* stop" because there was 1) "no report of possible criminal wrongdoing by [defendant]"; 2) no "citizen complaint of any kind, much less one for unlawful conduct"; 3) the ongoing investigation focused on any of the partying people; 4) the officers did not see or smell alcohol, nor did they allege that anyone appeared to be drunk; 5) there was no evidence that there was "anything in the cup appellant was holding, much less the color or smell of its contents"; 6) the covered cup that the defendant was holding was "opaque." *Id.* at 1086-87. The Court

10

reaffirmed that the Fourth Amendment "protects . . . the right to be let alone" and clarified that "[m]erely holding a styrofoam cup, covered or uncovered, would not tip the balance, even when the same person was also holding a paper bag under his arm." *Id.* at 1087 (cleaned up).

What eventually "tipped the balance" in *Jones* towards a finding of "reasonable suspicion supported by articulable facts" was when the defendant removed the cover of his cup and voluntarily stated to officers, "I'm just drinking." *Id.* At that point, because it was "possible" that the defendant was "merely drinking fruit juice or some other non-alcoholic beverage, or that the cup was empty and the bag contained closed containers or non-alcoholic items," the officer correctly "pursued the *minimal investigative step*" by "approaching" and asking him to "come here" to see whether he had an open container of alcohol. *Id.* (emphasis added). Noting that the Supreme Court has urged courts "to guard against police conduct which is over-bearing or harassing . . . while 'approv[ing] *legitimate and restrained* investigative conduct undertaken on the basis of ample factual justification," the court found the search lawful. *Id.* (cleaned up) (emphasis added).

This case features a setting even more benign than the one in *Jones*, with Mr. Abdul-Wali only walking at 6:30pm to the car of a friend. And each of the six initial circumstances detailed by the court in *Jones* is present here. *See supra* at 10. Importantly, as in *Jones*, nothing that Mr. Abdul-Wali did before the officers stopped his car and approached was indicative of furtive behavior or criminal action. He did not look drunk nor was he actively drinking alcohol. His bottles were

11

opaque and there was no way to tell whether they were alcohol, had been opened, or contained liquid. Mr. Abdul-Wali displayed no evasive behavior, and he was not seen with contraband or weapons. And there was no indication by the officers when they exited the vehicle that Mr. Abdul-Wali smelled of alcohol. *See also Freeman* Tr. 33 (finding no reasonable suspicion where officers did not report that defendant was "engaged in any nervous, furtive, or evasive behavior," "seen with any contraband or weapons," and did not "smell of alcohol or appear[ed] to be intoxicated."); *see also U.S. v. Washington*, 670 F.3d 1321 (D.C. Cir. 2012) (probable cause for POCA arrest after officers conducted a traffic stop, noticed a strong smell of alcohol emanating from the vehicle, observed the defendant was intoxicated, saw a small amount of red liquid in an open cup, and a puddle of liquid on the floorboard near the driver); *Perkins v. U.S.*, 936 A.2d 303 (D.C. 2007) (probable cause for POCA arrest where defendant was in close proximity to an open malt liquor can, sitting exposed to view on the center console of the car in which he was a front-seat passenger established probable cause to arrest him).

Moreover, unlike the defendant in *Jones*, Mr. Abdul-Wali never told the officers that he was drinking alcohol or gave any reason to suggest the same. That is why the officers *asked* whether the bottles were alcohol and demanded to see the bottles. Without any statement divulging that Mr. Abdul-Wali was drinking at the time, there are no articulable facts capable of supporting a finding of reasonable suspicion. Further, the manner in which the police approached Mr. Abdul-Wali in this case—U-turning and speeding their car to pull up right next to Mr. Abdul-Wali

before jumping out and grabbing the bottle from his hands—is exactly the kind of "over-bearing or harassing" police conduct that the Supreme Court required courts to guard against," and intrusive enough to require probable cause to justify Mr. Abdul-Wali's address. *Jones*, 584 F.3d 1083 at 1087.

## II.    Mr. Abdul-Wali Did Not Consent to Be Searched.

Absent even reasonable suspicion that Mr. Abdul-Wali was in possession of an open container of alcohol, the officers needed Mr. Abdul-Wali's consent to have his bottles searched to determine whether they were in fact open containers of alcohol. The first officer demanded, "Let me see that," and then stated, "Is that alcohol?" He then grabbed the bottle with the cups on it, lifted the cups, confirmed it had been opened, and looked at the bottle to confirm it was alcohol. But nothing in Mr. Abdul-Wali's response to the officers' demand, "Let me see that," satisfied the criteria for a valid consent to search.

As the D.C. Circuit has made clear, a party's consent to be searched must be unequivocal, specific, and freely and voluntarily given. *Lindsay*, 506 F.2d at 173. Consent, moreover, must be assessed by the totality of the circumstances, including the coerciveness of the environment as established by the number of officers, their placement, their manner of speech (including any coercion), and their dress, among other factors. *See, e.g.*, *Lindsay*, 506 F.2d at 168 (no consent to officers' search shortly after 4:35am); Wayne R. LaFave, 4 Search & Seizure § 8.2(b) (6th ed.) ("The presence of a number of policemen is likely to suggest that the police are

13

contemplating an undertaking which does not depend upon the cooperation of the individual from whom permission to search is being sought.")

Mr. Abdul-Wali's actions in response to being told "Let me see that" bore no indicia of consent. As an initial point, "let me see that" is not a request to examine the bottle—it is a *demand*. And it is a demand from an officer acting under color of authority that constitutes a show of lawful authority for purposes of the Fourth Amendment. *Bumper*, 391 U.S. at 548–49. Furthermore, it was a demand articulated almost immediately by an armed officer dressed in tactical gear who pulled quickly in an MPD car, quickly jumped out of his car within a couple feet of Mr. Abdul-Wali, and was backed up in seconds by at least four other officers from three MPD vehicles that were parked in front of, behind, and to the side of Mr. Abdul-Wali.



*BWC footage showing at least four officers to the rear and two MPD vehicles blocking defendant's right side*

These circumstances coupled with the demand, "let me see it" followed by the officer's snatching of the bottle from Mr. Abdul-Wali's hands were so coercive that they did not even allow Mr. Abdul-Wali the opportunity to evaluate whether to consent, and would render involuntary any consent even if such consent occurred. *Bumper*, 391 U.S. at 548–49 (finding consent was "no more than acquiescence to a claim of lawful authority" and therefore insufficient to satisfy government's burden).

### III. The Officer's Snatching of the Bottle and Lifting of the Cups Was a Search That Exceeded the Permissible Bounds of *Terry*.

The *Terry* exception to the Fourth Amendment's warrant requirement allows an officer who reasonably suspects that criminal activity is afoot to "briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). *Terry* further held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." 392 U.S. at 24. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. *Dickerson*, 508 U.S. at 373 (cleaned up). This type of "protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* (cleaned up).

15

Here, lacking reasonable suspicion that Mr. Abdul-Wali was doing anything wrong, the officers did not make any "reasonable inquiries" to confirm their hunch. *Id.* at 373. They did not make an inquiry at all. Instead, the first officer to exit demanded "let me see that" and snatched the bottle Mr. Abdul-Wali was holding right out of his hands. That snatch, coupled with the lifting of the cups on top of the bottle, exceeded the limited bounds of *Terry* because it was not a limited search for weapons, but rather an obvious search for evidence to support the officers' hunch. And because the incriminating character of the bottle Mr. Abdul-Wali was holding was not "immediately apparent," as evidenced by the officers' own questions and statements, *see supra*, the officers' decision to remove the cups from the top of the bottle was a manipulation and "further search . . . not authorized by *Terry* or by any other exception to the warrant requirement." *Dickerson*, 508 U.S. at 379 (explaining that the *Terry* frisk scope is akin to "plain view"); *see also Arizona v. Hicks*, 480 U.S. 321 (1987) (invaliding seizure of stolen stereo equipment because probable cause was obtained only after moving equipment to permit officers to read its serial numbers). Because the officers could not readily ascertain that Mr. Abdul-Wali was holding an *open* container of alcohol (that is, such an item was not in plain view), they were not lawfully permitted by "any exception to the warrant requirement" to uncover its incriminating character by seizing and manipulating the bottle. *Dickerson*, 508 U.S. at 379.

IV.    **Once the Officers Discovered that One of the Bottles Had Been Opened, There Was No Justification for a Further Search for Additional Evidence on or Around Mr. Abdul-Wali's Person.**

Even in the event that the officers had probable cause to arrest Mr. Abdul-Wali, once arrested for POCA, the officers' search incident to arrest was unlawful. When law enforcement officers have probable cause to make a lawful arrest, they may—incident to that arrest—search "the arrestee's person and the area 'within his immediate control.'" *Chimel v. California*, 395 U.S. 752, 763 (1969). Like other warrantless searches, a search incident to arrest "must be limited in scope," *Royer*, 460 U.S. 491, 500 (1983), and confined to "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel*, 395 U.S. at 763. At the time Mr. Abdul-Wali was handcuffed behind his back and surrounded by at least three officers, there was no reasonable fear for officer safety, and certainly no chance that there would be further evidence of a POCA offense on his person or immediate vicinity. Indeed, at the time the officers jumped out of their cars, there was no evidence that Mr. Abdul-Wali or those he was with had been drinking at all; all they saw was Mr. Abdul-Wali holding two opaque bottles. Any objective officer would have no reason to continue searching for evidence of POCA at this point because any further search would not be based on anything but a "mere hunch." That is what Judge Howell held recently in *Freeman*, where she distinguished her case from those in which the officers smelled alcohol or saw a puddle of alcohol and therefore "need[ed] to continue searching for 'the source of the liquid in the cup and the puddle.'" Freeman Tr. at 43. Similarly, the officers here had already found the

17

alleged open container of alcohol when they demanded to "see it" and thus there was no further need to search. *Id.* at 45 (distinguishing cases because "key facts of strong intoxication by the driver, the smell of alcohol, and the justification of finding the source of those alcohol indications are not present here").

### V.     Mr. Abdul-Wali's Firearm Was Recovered Attendant to the Unlawful Stop and Search.

Mr. Abdul-Wali's firearm was found in his waistband during the officers' pat-down incident to his arrest. But because that stop was unlawful, as explained above, the frisk attendant to the officers' arrest was unlawful. As such, that firearm was the fruit of an unlawful search and must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963) (any evidence or information obtained as a result of government illegality is a "fruit" of the illegality and may not be offered as evidence or used by the government).

### CONCLUSION

For these reasons, the firearm recovered from Mr. Abdul-Wali's waistband was the fruit unlawful search and must be suppressed.

Respectfully submitted,

A.  J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
UBONG E. AKPAN
ISRA BHATTY
Assistant Federal Public Defenders
625 Indiana Avenue, NW, Suite 550
Washington, DC  20004
(202) 208-7500

18